CITY OF HIGHLAND HEIGHTS, Appellee,

v.

GRISCHKAN, Appellant.

[Cite as *Highland Hts. v. Grischkan* (1999), 133 Ohio App.3d 329.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 73296.

Decided March 25, 1999.

330

Daniel W. Taylor, for appellee.

Charles J. Van Ness & Assoc., and Charles J. Van Ness, for appellant.

---

KARPINSKI, Judge.

Defendant-appellant, Michael Grischkan, appeals from the judgment of the Lyndhurst Municipal Court, which found that defendant violated Section 1335.03(b)(1) of the Codified Ordinances of the city of Highland Heights. This ordinance provides that all parcels of land within the city shall be graded to dispose of all surface water without ponding. On appeal, defendant argues that (1) the charges against him should have been dismissed because the parcels are owned, not by him personally, but by his corporation, (2) the court erred in finding defendant guilty of a continuing offense when the complaint charged defendant with a violation of only a specific date, (3) the court erred by allowing photographs into evidence that were not properly authenticated, and (4) the verdict was based on insufficient evidence and was against the manifest weight of the evidence. For the reasons that follow, we find merit to the fourth assignment of error and reverse the judgment of the court below.

This case concerns citations by the city of Highland Heights regarding two parcels of land within the city. The two parcels are owned by Creative Design Homes. On January 2, 1997, the city issued two citations; the first citation states:

"The undersigned, being duly sworn, upon his oath deposes and says: on <u>Thur.</u> the <u>2</u> day of <u>Jan.</u> <u>1997</u> at <u>10</u> A.M. at <u>Highland Hts., Ohio</u>

"Name <u>Grischkan, Michael</u> <u>Creative Design</u>

"Street <u>513 Longspur Rd. S/L 164</u>

"City-State <u>Highland Hts. Ohio 44143</u>"

The second citation was identical except it was for the property located at "482 Medway Rd. S/L—206." Defendant is the sole shareholder of Creative Design. The citations, one for a parcel of land on Medway Road and one for a parcel on Longspur Road, each alleged that on January 2, 1997, defendant violated city ordinance 1335.03(b)(1), which states:

"All lots, tracts or parcels shall be graded to provide proper drainage away from buildings and dispose of it without ponding; and all land within a development shall be graded to drain and dispose of surface water without ponding, except where approved by the Planning and Zoning Commission or its duly authorized representatives."

A trial commenced on July 29, 1997. The city's first witness was George Wilson. Wilson worked fifteen years as a building inspector and, before that, in private industry, first as a carpenter and later as a superintendent. Although the inspector testified that he observed the lots "since January 2nd of 1997," he did not see the lots on that date. He testified that the lots on Longspur and Medway were improperly graded in a higher mound:

"A. The dirt is built up. It's a higher mound.

"Q. And that higher mounding causes what?

"A. When it rains, the water runs off.

"THE COURT: Runs off to where?

"THE WITNESS: Toward the street.

"THE COURT: Toward the house of the left and to the right? These houses on both sides?

"THE WITNESS: Yes, it is.

"Q. And is that the grading problem that existed back on January 2nd, 1997?

"A. Yes."

In support of the citation, the inspector focused mainly on the high level of the lots, causing water to drain to the street and sides. The inspector could not specify the date he saw ponding. He answered that it occurred sometime between January 2nd and the date of his testimony, July 29, 1997:

"Q. But between January 2nd and today, this problem has existed with regards to this grade which results in this ponding?

"A. Right."

He later qualified that he could not say that the ponding had occurred on January 2nd; in fact, he could not say even when he first observed ponding.

The other witness for the city, Charles Stoner, who owns the neighboring lot on Medway, testified about water running from defendant's lot onto his property and the street. After the last rain he observed silt in front of his driveway in the street. Although Stoner testified regarding runoff water on his property, he did not state that he ever observed any standing water or ponding on the defendant's lots or on his own lot.

For his first witness, defendant called John Skonieczny, a professional surveyor. The surveyor did not view the property until July 23.[1] He found no evidence of standing water and no evidence of depressions that would hold standing water. More important, the parcels in question did not show any signs of "ponding" as he defined it.

The surveyor stated that ponding is caused when there is no place for the water to drain. Because of ground saturation, he said, the mere fact that there is some standing water on a property does not indicate ponding. "Ponding" is a term that refers to long-term gathering of water, not short-term gathering in insignificant indentations from ground saturations after a heavy rain. He directly observed, moreover, appropriate swales [2] and grading on each side of the properties. Specifically, he testified, both lots had swales on each side with Longspur draining both to the back and front. He added that Medway had a catch basin in the rear. He explained, "The swales were installed according to the city engineer. They were graded by the adjacent owners."

He added that the soil the neighbor observed running into the streets served only to corroborate the expert's opinion that the lots had been properly graded to allow drainage into storm sewers.[3] In fact, he concluded that the higher

---

1. During trial on July 29, the city inspector admitted that the grade of the lots stayed the same since January 2.

   Near the time of the trial, the land was apparently smoothed with a back hoe. Regarding the surveyor's ability to testify on the surface condition of the soil, nothing in the record directly specifies whether the surveyor viewed the land before or after the soil was smoothed.

   We may infer, however, it was after. On July 28, defendant photographed the Medway lot, which is shown as not yet smoothly graded. On July 24th plaintiff photographed the Longspur lot, also shown as not yet smoothly graded. Since the surveyor viewed the land on July 23rd, we may conclude, therefore, that he saw the surface of the lots in the same condition they were in on January 2.

2. " 'Swale' means a "low lying stretch of land which gathers or carries surface water runoff." Highland Heights Codified Ordinance 1335.02(m). The surveyor explained that a "swale is a low area of the land where water discharges."

3. Since homes had not yet been built on the lots, no final grading had occurred. Nor was one required at that point. (Chapter 1335.03[C] Highland Heights Codified Ordinances.)

elevation of defendant's lots had no adverse effect, rather it allowed the lots to drain more quickly.

Defendant, himself, testified that the lots had been graded properly with swales to allow drainage during the entire time in question. In agreement with his expert, he testified that the height of the dirt on the two lots enhanced the ease of drainage. Defendant said he had never witnessed any ponding on the two lots. Regarding the runoff, defendant believed that any time the topography of the land slopes down, there is going to be a certain amount of dirt washing off.

The trial court found defendant guilty of fifty separate violations of 1335.03(b)(1), and sentenced him to twenty days for the Longspur parcel and thirty days for the Medway parcel, and fined him $100 a day. Defendant was thus fined a total of $5,000.

Defendant timely appeals, raising four assignments of error. Because it is dispositive of the appeal, we need address only the fourth assignment of error:

"IV. The verdict of the trial court is against the manifest weight and sufficiency of the evidence and must be reversed."

The fourth assignment raises the issue of both sufficiency and manifest weight of the evidence. In *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541, 546, the court stated the standard for evaluating claims of insufficient evidence:

"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.

"With respect to sufficiency of the evidence, ' "sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed.1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560." *Id.* at 386–387, 678 N.E.2d at 546.

## A. ORDINANCE

In the case at bar, defendant was charged with a violation of Section 1335.03(b)(1) of the Codified Ordinances of Highland Heights, which provides:

"All lots, tracts or parcels shall be graded to provide proper drainage away from buildings and dispose of it without ponding; and *all land within a development shall be graded to drain and dispose of surface water without ponding*, except where approved by the Planning and Zoning Commission or its duly authorized representatives." (Emphasis added.) *Id.* at 386–387, 678 N.E.2d at 546–547.

█ Defendant's two parcels were "within a development." We are concerned only with the above-italicized portion of the ordinance, which portion was expressly referenced in the citation, that is, whether defendant's two lots were graded to dispose of surface water *without ponding.*

The ordinance never specifically defines ponding. The parties and witnesses, moreover, appear to disagree on this word. To support its citation, the city offered testimony of (1) an inspector who observed standing water in indentations on defendant's property and (2) a neighbor who saw runoff along the length of a his property and onto his driveway and the street. On the other hand, defendant, along with his expert, explained how the overall topography of the land produces proper drainage and denied that standing water always indicates a violation of the ordinance.

Presented with no clear and agreed upon definition of the technical term of "ponding," we must be guided by Section 501.04 of the Codified Ordinances of Highland Heights:

"(a) Sections of the Codified Ordinances defining offenses or penalties shall be strictly construed against the municipality and liberally construed in favor of the accused." See, also, R.C. 2901.04.

We followed this approach in *Cleveland v. Pugh* (1996), 110 Ohio App.3d 472, 674 N.E.2d 759:

█ "The rules of construction for ordinances and statutes which define offenses are the same. *Vermilion v. Stevenson* (1982), 7 Ohio App.3d 170, 7 OBR 215, 454 N.E.2d 965. Ordinances defining offenses or penalties shall be strictly construed against the city and liberally construed in favor of the accused." *Id.* at 474, 674 N.E.2d at 760.

We must clarify ponding, therefore, by construing the ordinance in favor of the accused. The surveyor stated that ponding is caused when there is no place for the water to drain. Because of ground saturation, he said, the mere fact that there is some standing water on a property does not indicate ponding.[4] The

---

4. This interpretation regarding size is consistent with Black's Law Dictionary, which defines a "pond" as, "A body of stagnant water without an outlet, *larger than a puddle* and smaller than

surveyor thus concluded that ponding refers to long-term gathering of water that has no place to drain, not short-term gathering in insignificant indentations from ground saturation after a heavy rain.

We accept this definition of ponding. It is unreasonable to apply the term to puddles of water observed for a short time after a heavy rainfall. Nor can it apply to standing water that results from unevenness or small imperfections in the surface, such as footprints, tire tracks, small craters, or ruts,[5] unless it is of long duration such as to indicate that water has no place to drain.

## B. INSUFFICIENCY OF THE EVIDENCE

■ For a variety of reasons, the testimony is insufficient to support the citation. While the inspector says that he observed ponding, he does not explain what he considers ponding. It is not clear that he is referring to anything more than temporary puddles. In fact, the witness relates the standing water to the presence of rocks. Asked what was "different with the water as of July 29th on the Longspur lot," he answered, "Because its [sic] graded now. Before it was all rocks." This testimony raises the question of whether the inspector was observing water merely on rocky, uneven land that had not been finally graded and, therefore, whether the citation was erroneously issued because the lot was not finally graded.

The inspector states that he saw standing water on the lots several times, but he does not state any specific date when he witnessed standing water on defendant's properties. He said he drove by *every day,* but he reported seeing standing water only *several times.* He stated he got out of the car to observe the lots "maybe four or five times" in the course of six months, but he does not report seeing standing water on those occasions. In other words, from his car he observed standing water a few times in six months. Furthermore, he did not give any context to his observations or any details about the standing water, that is, how much precipitation had occurred at the time, how much water had accumulated, or how long the water had remained on the surface of the property.

Defendant presented expert testimony that there was no ponding and that the lots were properly graded. When asked to define "ponding," the surveyor stated as follows:

"When there is poinding [sic] there is no place for the water to drain."

---

a lake; or a like body of water with a small outlet." (Emphasis added.) Black's Law Dictionary (5 Ed.1979) 1044.

**5.** We note that the Highland Heights Code does not mandate that the soil be smooth when a home has not yet been built. Importantly, the code does not anticipate final grading until after construction. Chapter 1335.03(C), Highland Heights Codified Ordinances.

The surveyor found no direct evidence of ponding and no evidence on which to infer that ponding would occur. He further explained that the lot was properly graded to drain:

"Q. Are you familiar with what's the purpose of the swale?

"A. Yes.

"Q. What is the purpose?

"A. It provides drainage for rain water.

"Q. Did you find swales there?

"A. There are swales on all 4. On the 2 properties that you are concerned about, there are swales on each side of the property which would adquately [sic] drain any water.

"Q. In terms of the graded lot[s], were they properly graded for the swales?

"A. Yes, they were humped up in the middle so any rain water would discharge to the swales.

"  *  *  *

"Q. On the date you inspected these lots did you find the swales were properly in place?

"A. Yes.

"Q. Again, what effect, if any, does the fact that the lot, the surface of the lot may be higher than the surrounding lots, have on the ability for the lot to drain water properly?

"A. Wouldn't have that much of an adverse effect. It would just drain a little quicker but nothing of substance."

Defendant testified that the swales were in place during the entire time in question. Both witnesses concluded that the swales properly discharged the water off the lots.

The city's two witnesses, a building inspector and a neighbor, did not offer any evidence to rebut this evidence that the lots were properly graded for drainage. The main contention of the building inspector was that the elevation of the two graded lots was higher, presumably higher than the adjacent lot and the street, which grading would cause a runoff into the street and the sides. This observation does not address the ordinance's mandate to dispose of water without ponding. On the contrary, it corroborates the defense, which argued that the water drained off the property and did not accumulate. Moreover, the surveyor testified that this elevated grade was approved by the city engineer and actually aided drainage.

Stoner testified that the runoff occurred all along his yard and that recently after a heavy rain he observed silt on the street in front of his driveway. Since a swale ran all along his yard, this testimony corroborated what the defense expert said about the swales providing drainage by channeling the water into the street basin. Moreover, no one explained why such channeling would not be proper drainage.[6] In fact, the city's evidence appears contradictory. On the one hand, the city claims there is standing water and, on the other hand, it observes water running off.

■ More important than these unresolved contradictions is the vagueness of the city's witness. The inspector testified that he observed water on the property, but was not able to state, however, exactly where or when he observed this water on each lot. A conviction under an ordinance requires a higher level of detail. See *Cleveland v. Papadelis* (1997), 121 Ohio App.3d 152, 699 N.E.2d 131 (testimony that grass was high was insufficient to sustain a conviction for having grass greater than ten inches). Similarly in the case at bar, testimony that the lots were higher, is insufficient. Nor is the problem solved by further testimony of vague observations of standing water. Water observed immediately after a heavy rainfall on an irregular surface might not properly be considered ponding. On the other hand, water remaining after a light rain would be another matter. In order to determine whether ponding existed on the lots, the city needed to present more details such as whether the rain was light or heavy, where and how much water accumulated, and how long the water remained. Mere observations by a passerby inspector that some water was seen on the property on a few occasions over six months is insufficient.[7] Moreover, the city would have to present clear testimony that the water was not draining off the property.

*Judgment reversed.*

TIMOTHY J. MCMONAGLE and PATTON, JJ., concur.

---

6. We must note that Exhibit H, a photograph of the Stoner lot, clearly shows that the property to the rear of Stoner's slopes sharply downward toward Stoner's lot. This slope in the rear would also add runoff onto Stoner's property and require the city to account for what each property might contribute to what ran off into the swale and onto the street.

7. The disposition of this assignment of error renders the remaining assignments moot. App.R. 12. The remaining assignments state as follows:

"I. The trial court erred in denying appellant's motion to dismiss charges against the defendant as an individual since the properties were wholly owned by a corporation.
"II. The trial court erred in permitting the state to present evidence and ultimately convicting defendant upon essential facts not in the complaints, and any amendment of said complaints would not be permitted under Criminal Rule 7(D)."

"III. The trial court erred in admitting photographs into evidence over appellant's objection which allegedly depict the conditions charged in appellee's complaint."