OPINION
{¶ 1} Appellant, James M. Harber, appeals from a jury conviction by the Lake County Court of Common Pleas. For the reasons that follow, we affirm Harber's convictions.
 {¶ 2} Harber was indicted on the following counts: count one, aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(1); count two, aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(2); *Page 2 
count three, aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(1); count four, felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2); and count five, felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2). Each count carried an accompanying firearm specification in violation of R.C. 2941.145. Harber pled not guilty to the above charges. A jury was impaneled, and a jury trial ensued.
 {¶ 3} The jury heard evidence surrounding a reported home invasion that occurred on May 17, 2007, at 8600 Hendricks Road. At 3:32 a.m., on said date, the Mentor Police Department was dispatched; it was reported that two suspects had fled the scene.
 {¶ 4} Patrolman David Paulchel of the Mentor Police Department arrived at 8600 Hendricks Road. Present at the home were the homeowner, Chris Brown, and two of his friends, Ernie Welch and Jim Morovitz. Upon arriving at the scene, Patrolman Paulchel observed that Mr. Brown had a bleeding cut on his forehead, and Mr. Welch had a bleeding cut on the back of his head.
 {¶ 5} Surveying the scene of the incident, Patrolman Paulchel determined the point of entry was a glass door at the rear of the house. Patrolman Paulchel testified that one of the glass doors was shattered, and the majority of the glass was strewn about the inside of the house. In the small amount of glass outside, a roll of black electrical tape was located. Further, among the glass on the floor inside the house, Patrolman Paulchel noticed an ejector rod from a revolver handle. Patrolman Paulchel testified that on the floor, "just inside the main door from the house into the garage," was a cylinder from a revolver wrapped in black electrical tape, two unfired bullets, and one *Page 3 
spent casing. The frame of the gun was found near the driveway in the grass. At the scene of the incident, Patrolman Paulchel obtained written statements from Mr. Brown, Mr. Welch, and Mr. Morovitz.
 {¶ 6} The jury also heard the testimony of Mr. Welch. Mr. Welch testified that he was at Mr. Brown's residence on May 17, 2007, performing bodywork on a car in the garage. Mr. Welch entered the house and, upon opening the door from the garage, discovered an intruder was standing in the home. The intruder, who Mr. Welch identified as Harber, drew his gun on Mr. Welch. Mr. Welch closed the door, tripped, and fell to the ground in the garage. Then, Harber entered the garage, yelled "get down," and hit Mr. Welch in the back of his head with the gun. Although Mr. Welch testified that he was in a "daze" after he had been hit in the head, he observed Mr. Morovitz struggling with Harber.
 {¶ 7} At Harber's trial, Mr. Brown also testified. Mr. Brown indicated that he was working in the garage with Mr. Welch and Mr. Morovitz; however, he was on the other side of the garage with Mr. Morovitz. Mr. Brown heard a noise, got up, and observed Harber running towards them with a gun, yelling "[e]verybody is going to die. Get down. Everybody get down." Harber then struck Mr. Brown in the head with the gun.
 {¶ 8} At this point, Mr. Morovitz went after Harber, and a struggle ensued. Mr. Morovitz was able to free the gun from Harber, and Harber fled the scene of the incident. Mr. Brown further testified that he had not invited Harber to his home, and he did not know Harber prior to this incident.
 {¶ 9} After the incident, it was reported that one of the suspects fled the home of Mr. Brown in a gold, Ford Ranger truck. The make, model, and license plate number of *Page 4 
the suspect's vehicle were made known through dispatch; the vehicle was registered to Harber. Eastlake police officers apprehended Harber at his home. Shortly thereafter, Detective Conrad Straube, of the Mentor Police Department, arrived. Harber spoke with Detective Straube at his home. Detective Straube testified that Harber was immediately advised of hisMiranda rights. After indicating that he understood his rights, Harber indicated that he wanted to speak with Detective Straube. Detective Straube testified that Harber informed him that he was the individual involved in the altercation at Mr. Brown's home. Further, Harber stated that he was acquainted with Mr. Brown and that he and a friend, Michael Radovanic, were attending a party at his home that evening. At the party, an argument escalated into a physical altercation. After the altercation, Harber left the home of Mr. Brown.
 {¶ 10} After speaking with Detective Straube, Harber was transported to the Mentor Police Department.
 {¶ 11} Detective Straube then spoke with Marie Joseph and her daughter, Angela, who were both present at Harber's home when the police arrived. Also, Detective Straube interviewed Mr. Radovanic concerning the instant incident. Based on the information he received from his conversations with Ms. Joseph and Mr. Radovanic, Detective Straube continued to question Harber at the police station, where a written statement was collected. Detective Straube indicated that when Harber spoke about Mr. Brown, he became very angry, agitated, and started to shake. Harber revealed that he was upset over a situation that occurred between Mr. Brown and Angela, which allegedly involved drug use. Harber felt it necessary to solicit the assistance of Mr. Radovanic and then go to Mr. Brown's house to scare him and steal drugs. Upon *Page 5 
arriving at Mr. Brown's house, Harber and Mr. Radovanic walked to the back of the house. Using the gun to break the glass, Harber and Mr. Radovanic entered Mr. Brown's home. At this point, Harber and Mr. Radovanic split up, since Mr. Radovanic was to steal the drugs and Harber was to find Mr. Brown. Harber explained that he first struck Mr. Welch in the head with the gun. After Mr. Welch fell to the ground, Harber struck Mr. Brown with the gun. Harber stated that as he was striking Mr. Welch and Mr. Brown with the gun, he yelled several different phrases including: "[g]et on the ground;" "[w]ho wants to die tonight;" and "[y]ou're all going to die tonight." After striking Mr. Morovitz, Harber mentioned that he felt something hit him in the back of the head, and he fell to the ground. After a struggle, Harber fled the scene.
 {¶ 12} During trial, Harber testified in his own defense. Harber testified that he had met Mr. Brown on several occasions before the night of the incident. Harber indicated that he had previously engaged in drug activity with Mr. Brown and that he had spoken numerous times with him on the telephone. At approximately 12:00 a.m., on May 17, 2007, Harber received a telephone call from Ms. Joseph regarding her daughter, Angela, who was missing. After Angela was found, Harber became upset because he believed she was using heroin. At this point, Harber explained that he took the gun, which was taped together, and drove to Mr. Brown's home to scare him and steal any drugs that may have been in the home. At Mr. Brown's house, Harber broke the back window with a rock, causing him to lose his balance and fall to the floor. As he was getting up off the floor, Mr. Welch began to come after Harber. Harber then attempted to retrieve his gun from his sweatshirt, but because of its deplorable condition, it began to fall apart. Mr. Welch then retreated to the garage, where he *Page 6 
tripped and struck his head on the floor. Harber testified that five men were present in the garage; two of which were protecting Mr. Brown, who was located on the other side of the garage. Once inside the garage, Harber further testified that he did not strike any of the men with the gun. In fact, Harber testified the men in the garage knocked him in the head and hit him with various tools. Eventually, Harber was able to escape the garage and flee the scene in his truck.
 {¶ 13} Following the trial, the jury unanimously found Harber guilty on all the charges set forth in the indictment. On August 20, 2007, the trial court issued a judgment entry sentencing Harber to five years in prison on count one, five years in prison on count three, five years in prison on count four, and five years in prison on count five. Count two was merged into count one. Each term of incarceration was to be served concurrently, but consecutive to a sentence previously imposed upon Harber in another case in the Lake County Court of Common Pleas. In addition, Harber was ordered to serve a mandatory three-year term for the gun specification on each count, to run concurrently with each other, but consecutive to the underlying prison term. Therefore, Harber was sentenced to a total term of imprisonment of eight years for his convictions and firearm specifications in this matter.
 {¶ 14} From this judgment, Harber filed a timely notice of appeal and set forth two assignments of error.
 {¶ 15} Harber's first assignment of error states:
 {¶ 16} "The preparation and performance of appellant's trial counsel was deficient and prejudiced appellant in such a way as to violate appellant's rights as *Page 7 
guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution."
 {¶ 17} Under Harber's first assignment of error, he alleges two claims: (1) ineffective assistance of counsel based on his trial counsel's failure to make a Crim. R. 29 motion for acquittal, and (2) the state produced insufficient evidence at trial to support his convictions.
 {¶ 18} In State v. Bradley, the Supreme Court of Ohio adopted the following test to determine if counsel's performance is ineffective: "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus, adopting the test set forth inStrickland v. Washington (1984), 466 U.S. 668. Moreover, "`a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, * * * that course should be followed.'" Id. at 143, quotingStrickland, 466 U.S. at 697.
 {¶ 19} Pursuant to Crim. R. 29(A), a trial court is required to order an acquittal of "one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."
 {¶ 20} "The failure to assert a Crim. R. 29 motion is not, per se, ineffective assistance of counsel." State v. Shaffer, 11th Dist. No. 2002-P-0133, 2004-Ohio-336, at ¶ 33. In asserting a Crim. R. 29 motion in a criminal case, the defense is testing the *Page 8 
sufficiency of the evidence. Although Harber failed to timely file a Crim. R. 29 motion for acquittal with the trial court, and the challenge of the sufficiency of evidence was not preserved for appeal, we will address Harber's sufficiency arguments on the merits in light of his claim of ineffective assistance of counsel. State v. Blackburn, 11th Dist. No. 2001-T-0052, 2003-Ohio-605, at ¶ 43. (Citation omitted.)
 {¶ 21} We note that the Supreme Court of Ohio, in State v.Bridgeman, established the standard for evaluating motions for acquittal. State v. Bridgeman (1978), 55 Ohio St.2d 261. TheBridgeman Court stated that, "[p]ursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." Id. at syllabus. When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307. Thus, "[a]n appellate court must look to the evidence presented to determine if the state offered evidence on each statutory element of the offense, so that a rational trier of fact may infer that the offense was committed beyond a reasonable doubt."State v. Clark, 11th Dist. No. 2002-A-0056, 2003-Ohio-6689, at ¶ 16. Furthermore, "[t]he verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the [jury]." State v. Dennis (1997), 79 Ohio St.3d 421, 430. *Page 9 
 {¶ 22} At the outset, we recognize that Harber claims "there is no credible evidence that [he] committed aggravated robbery, aggravated burglary or felonious assault." In challenging the sufficiency of the evidence, Harber does nothing more than attack the credibility of Mr. Welch, Mr. Brown, and Detective Straube. In fact, Harber has failed to put forth any argument relating to the elements of the charged offenses. Nonetheless, we will address whether appellee presented sufficient evidence to sustain Harber's conviction for aggravated robbery, aggravated burglary, and felonious assault.
 {¶ 23} Harber was convicted of aggravated burglary, in violation of R.C. 2911.11, which provides, in pertinent part:
 {¶ 24} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 {¶ 25} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 {¶ 26} "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."
 {¶ 27} Furthermore, Harber was convicted of aggravated robbery, a violation of R.C. 2911.01(A)(1), which provides, in pertinent part: *Page 10 
 {¶ 28} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 29} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"
 {¶ 30} First, Harber admitted to using force to gain entry into Mr. Brown's home. Further, Harber testified that he took a gun to Mr. Brown's home with the intent to scare Mr. Brown and steal any drugs that may have been in the home. In addition, the state presented the testimony of Mr. Welch and Mr. Brown who testified that Harber pointed his gun at each of them, used threatening language toward them, and used the gun to strike each of them in the head. Further, Detective Straube testified that Harber told him that he went to Mr. Brown's home to scare Mr. Brown and to steal drugs. Harber also admitted to Detective Straube that he struck Mr. Welch and Mr. Brown in the head with the gun. In the instant case, there was substantial evidence upon which the jury could have reasonably concluded that all of the elements of the offense of aggravated burglary and aggravated robbery were proven beyond a reasonable doubt.
 {¶ 31} The jury also found Harber guilty of felonious assault, in violation of R.C. 2903.11 (A)(2), which provides that "no person shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 32} The testimonial evidence at trial revealed that Harber pointed a gun at Mr. Welch and Mr. Brown; used threatening language indicating intent to use the gun; and *Page 11 
struck both of them in the head with it. See, e.g., State v. Green
(1991), 58 Ohio St.3d 239, 242. The jury was also presented with the exhibits of the state, which depicted the head wounds sustained by both Mr. Welch and Mr. Brown. Based on the foregoing, this court concludes that the state presented sufficient evidence for the trier of fact to find Harber guilty of felonious assault.
 {¶ 33} Harber also challenges the sufficiency of the evidence as to the accompanying firearm specifications claiming the gun was inoperable. R.C. 2941.145, provides, in pertinent part:
 {¶ 34} "(A) * * * the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense. * * *"
 {¶ 35} "Firearm" is defined in R.C. 2923.11(B)(1) as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable."
 {¶ 36} Furthermore, "[w]hen determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2).
 {¶ 37} Therefore, in order to support a firearm penalty enhancement, evidence must be presented that would establish a gun as a firearm.State v. Cunningham (Jan. *Page 12 
31, 1985), 8th Dist. No. 48558, 1985 Ohio App. LEXIS 5612, at *11-12. (Citations omitted.) Proof of a firearm's operability does not require expert ballistic testimony; circumstantial evidence may be sufficient to support this finding. Id. (Citations omitted.)
 {¶ 38} At trial, the state presented evidence from Mitch Wisniewski, a firearm expert analyst from the Lake County Crime Lab. Mr. Wisniewski testified that, based on his experience and upon examination of and test-firing the gun, he determined that it was operable. Moreover, Mr. Wisniewski testified that the spent casing found at the scene of the incident was fired from the gun that Harber carried to Mr. Brown's home. Therefore, when viewing the evidence adduced at trial in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the firearm specification were proven beyond a reasonable doubt.
 {¶ 39} We further note that although Harber's counsel alleged, at oral argument, that the indictment was defective and did not meet constitutional requirements pursuant to State v. Colon,118 Ohio St.3d 26, 2008-Ohio-1624, his argument was not properly before this court. Harber failed to raise the alleged defect in his appellate brief submitted to this court, as required by App. R. 16, and this argument is therefore without merit. However, even if Harber would have properly raised this argument in his appellate brief, an independent review of the indictment reveals that the holding in State v. Colon is inapplicable in the instant matter, for this is not a case where the indictment contained a structural defect or where a defect was not raised or corrected in the trial court. Id. at ¶ 45.
 {¶ 40} Since the prosecution provided sufficient evidence to sustain the verdicts, the motion for acquittal should have been denied. Therefore, Harber did not suffer any *Page 13 
prejudice by his trial counsel's failure to move for acquittal pursuant to Crim. R. 29 and, accordingly, his first assignment of error is without merit.
 {¶ 41} Harber's second assignment of error states:
 {¶ 42} "The judgments of convictions here are against the manifest weight of the evidence, in violation of appellant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution."
 {¶ 43} When addressing whether a verdict is against the manifest weight of the evidence, the Supreme Court of Ohio has adopted the following test:
 {¶ 44} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387. (Citations omitted.)
 {¶ 45} The weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide. State v.DeHass (1967), 10 Ohio St.2d 230, 231.
 {¶ 46} Further, "[t]he trier of fact is free to believe or disbelieve all or any of the testimony. * * * The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. * * * Consequently, although an appellate *Page 14 
court must act as a `thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility. * * *" State v. Sevilla, 10th Dist. No. 06AP-954,2007-Ohio-2789, at ¶ 13. (Internal citations omitted.)
 {¶ 47} In the instant case, the jury was presented with conflicting testimony and, therefore, the jury had to determine the credibility of each witness. The jury heard the testimony of Mr. Welch, Mr. Brown, and Detective Straube, who all provided nearly identical testimony as to the events of May 17, 2007. In addition, testimony was elicited from Patrolman Paulchel who arrived at Mr. Brown's home shortly after the incident in question. The jury was also presented with the testimony of Mr. Wisniewski as to the operability of the gun possessed by Harber. Although Harber's version of the facts differs from those presented by the state, the jury was in the best position to resolve this inconsistency.
 {¶ 48} Therefore, after reviewing the record and weighing the evidence and all reasonable inferences, we cannot conclude the jury lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. Harber's second assignment of error is not well-founded.
 {¶ 49} The judgment of the Lake County Court of Common Pleas is affirmed.
DIANE V. GRENDELL, P.J.
 MARY JANE TRAPP, J., concur. *Page 1