[Cite as *State v. Stinebaugh*, 2024-Ohio-2677.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    CASE NO. 2-22-27

    v.

THOMAS ALAN STINEBAUGH,

    O P I N I O N

    DEFENDANT-APPELLANT.

---

**Appeal from Auglaize County Common Pleas Court**
**Trial Court No. 2021 CR 0125**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:  July 15, 2024**

---

**APPEARANCES:**

    *Andrew R. Mayle and Benjamin G. Padanilam* **for Appellant**

    *Micah R. Ault* **for Appellee**

**WILLAMOWSKI, P.J.**

*Introduction*

**{¶1}** Defendant-appellant Thomas A. Stinebaugh ("Stinebaugh") appeals the judgment of the Auglaize County Court of Common Pleas, arguing that two of his five convictions are not supported by sufficient evidence and that his trial counsel was ineffective. On appeal, the issue is not whether Stinebaugh acted ethically but whether the State properly established the two challenged convictions.

**{¶2}** Upon review, the conviction for having an unlawful interest in a public contract is reversed because the State charged Stinebaugh under R.C. 2921.42(A)(1) but failed to prove he had a definite and direct interest in the contract at issue. The conviction for theft in office is reversed because the State failed to prove that the expenditure at issue lacked authorized consent. This decision does not affect the three convictions Stinebaugh has for conflicts of interest in violation of R.C. 103.02(D).

**{¶3}** Further, while Stinebaugh asserts that his attorney was ineffective, he failed to prove that his counsel's performance was deficient. For the reasons set forth below, the judgment of the trial court is affirmed in part and reversed in part.

*Facts and Procedural History*

**{¶4}** On January 1, 2016, Stinebaugh took office as the Mayor of the City of Wapakoneta. Tr. 322, 931. As this was a part-time position, Stinebaugh continued to operate his building and remodeling company in addition to his official duties.

Tr. 322, 923. Prior to taking office, Stinebaugh asked Chad Scott ("Scott") to serve as the city's safety service director. Tr. 319. Scott accepted this offer and began working in this position at the end of January 2016. Tr. 322. In this capacity, Scott reported directly to Stinebaugh and had no other supervisors. Tr. 320-321. In turn, the superintendents in the departments of engineering, waste management, and public works reported to Scott. Tr. 321.

{¶5} In April of 2018, Stinebaugh applied for a building permit from the city so that he could construct a house for a client on a lot at 708 Fairview Drive in Wapakoneta. Tr. 338-339, 573. This property had been a part of a parcel of land that Stinebaugh had previously purchased and then divided into two lots. Tr. 946, 971-972. These two lots sat in between Fairview Drive and South Street. Tr. 738. However, the portion of South Street that was directly behind these lots was an unimproved right-of-way. Tr. 532, 738. A trailer park was located on Fairview Drive across the street from these two lots. Tr. 532, 736.

{¶6} The superintendent of zoning and engineering, Mary Ruck ("Ruck"), testified that Andy Beane ("Beane") was the technician from the Engineering Department who processed Stinebaugh's application for a building permit. Tr. 531. Ruck testified that Beane told Stinebaugh that he would have to tie the house into a public sewer line that ran along the other side of Fairview Drive and serviced the

units in the trailer park.[1]  Tr. 532.  To tie into this existing sewer line, Stinebaugh would have had to either "bore under the street" and connect to the tap with a pipe or "open cut" the street, lay the pipe, and repair the roadway.  Tr. 545.

{¶7} Ruck testified that Stinebaugh "contacted our office and did not want to tap into the Fairview line" across the street from the lots.  Tr. 532.  She stated that Stinebaugh instead wanted the city to extend an existing public sewer line on the improved portion of South Street into the unimproved right-of-way that was located behind the house he had built.  Tr. 532.  Stinebaugh would then tap the house into the extended public sewer line behind the property.  Tr. 532-533.  In contrast to the more expensive process of tying the house into the sewer line across Fairview Drive, Stinebaugh would have to provide for a $370.00 tap fee to connect the house to an extended public sewer line behind the house.  Tr. 545.  Ruck testified that Beane examined the property and concluded that the extension of the public sewer line on South Street was feasible.  Tr. 534.

{¶8} Stinebaugh testified that, contrary to Ruck's testimony, Beane never told him that he would have to tie into a public sewer line across the street in the process of applying for the building permit.  Tr. 948.  He stated that, after the house was framed, Ruck came to the site and told him that he would have to tap into a sewer line across Fairview Drive.  Tr. 948-949.  Stinebaugh testified that, after he

---

[1] At trial, a dispute existed as to whether the sewer line that serviced the mobile home park across the street was public or private.  Tr. 435, 568, 580-582, 736, 743, 950.  Ex. 50.

questioned whether he had to dig across the street, Ruck pointed out that a public sewer line was located on South Street behind the lot and told him that she would send Beane to the property to determine the feasibility of using that public sewer line. Tr. 949-950.

{¶9} Scott testified that Stinebaugh then approached him and spoke about having the city extend the public sewer line from the improved portion of South Street and into the unimproved right-of-way behind 708 Fairview Drive. Tr. 339. Scott testified about his response as follows:

> I told Tom [Stinebaugh] I thought, you know, like any other case in the City, the developer installs the sanitary sewer line, water line, and then the City takes it over. It's right in the codified ordinances of the City where the developer is responsible for the installation of water and sewer.

Tr. 339. Scott then testified that Stinebaugh "didn't like [his] * * * answer." Tr. 339. He also explained that the safety service director would have to sign a purchase order for such a project to move forward. Tr. 341.

{¶10} Scott testified that, around this time, Stinebaugh indicated that he was going to begin looking for a new person to serve as safety service director. Tr. 340-341. Around two months after this conversation, Stinebaugh terminated Scott in early July of 2018. Tr. 340. Stinebaugh testified that he terminated Scott because other department heads were complaining about him. Tr. 951. He also stated that Scott had begun "bad mouthing" him after their conversation about finding a new safety service director. Tr. 951.

{¶11} Ruck testified that Stinebaugh "directed" her department "to put in the sewer" line along the unimproved right-of-way. Tr. 534. She affirmed that she believed that the city should not extend the public sewer line as the developer typically provides for this cost. Tr. 534, 537. Ruck testified that she reported to the safety service director and the mayor. Tr. 528. She voiced her concerns with the safety service director but "was told to do it." Tr. 538. Ruck began the process of installing the sewer line because she "was told by the Mayor to do it." Tr. 537. She added that she "did it because he was the Mayor. And he could fire you if he wants to." Tr. 538.

{¶12} The Engineering Department then contacted Schaub Excavating to complete this project. Tr. 539. The purchase order for this expenditure was signed by Ruck, and the new safety service director, as well as by the city auditor. Ex. 24, 25. Tr. 566. The contractor was then directed to extend the public sewer line completely along the unimproved right-of-way and to install roughly fourteen different taps to accommodate future housing projects on the empty lots that are located along this stretch of real estate. Tr. 563, 576, 658. *See* Tr. 985.

{¶13} Ruck was asked why the city did not simply extend the public sewer line the "extra few feet" that was required to accommodate the house at 708 Fairview Drive. Tr. 562. She explained that extending only "a little section" of the public sewer line might inhibit the effectiveness of further extensions down the unimproved right-of-way to accommodate future housing builds on the other vacant

lots. Tr. 562-563. For this reason, her office decided to extend the public sewer line beyond what was necessary to service 708 Fairview Drive. Tr. 563.

{¶14} Schaub Excavating then laid roughly 750 feet of eight-inch pipe to extend the South Street sewer line along the unimproved right-of-way. Tr. 539, 544. After completing this project, Schaub Excavating submitted an invoice on October 5, 2018. Tr. 739. The total cost of this project was $13,234.00. Tr. 540, 737.

{¶15} On July 22, 2021, Stinebaugh was indicted on eight counts of having an unlawful interest in a public contract in violation of R.C. 2921.42(A)(1), fourth-degree felonies; eight counts of conflict of interest in violation of R.C. 102.03(D), first-degree misdemeanors; and one count of theft in office in violation of R.C. 2921.41(A)(1), a third-degree felony.[2] Doc. 1. On motion of the State, the trial court dismissed three of the counts of having an unlawful interest in a public contract and three of the counts of conflict of interest. Tr. 5. On October 24, 2022, a jury trial on the remaining charges began.

{¶16} On October 29, 2022, the jury returned verdicts of guilty on three counts of conflict of interest in violation of R.C. 102.03(D), first-degree misdemeanors; one count of having an unlawful interest in a contract in violation of R.C. 2921.42(A)(1), a fourth-degree felony; and one count of theft in office in

---

[2] On appeal, Stinebaugh only challenges the felony convictions that relate to the extension of the public sewer line. For this reason, we have only set forth the facts that describe the conduct that is relevant to these charges.

violation of R.C. 2921.41(A)(1), a fifth-degree felony.[3]  Doc. 120, 124.  The jury

acquitted Stinebaugh of the remaining six charges.  Doc. 120, 124.  The trial court

released its judgment entry of sentencing on November 14, 2022.  Doc. 120.

{¶17} Stinebaugh filed his notice of appeal on December 12, 2022.  Doc.

127.  On appeal, he raises the following three assignments of error:

### First Assignment of Error

**Stinebaugh's fourth-degree felony conviction under R.C. 2921.42(A)(1) is erroneous as a matter of law on insufficiency grounds because, at most, the evidence demonstrated he had an interest in the benefits of the underlying contract, which is a first-degree misdemeanor under R.C. 2921.42(A)(4).**

### Second Assignment of Error

**Stinebaugh's fifth-degree felony conviction under R.C. 2921.41(A)(1) is erroneous as a matter of law on insufficiency grounds because the City of Wapakoneta has the authority to install sewer lines in the public right-of-way and three appropriate city officials—including the independently elected city auditor—consented to the sewer line extension.  Thus, no predicate theft offense, which is necessarily distinct from having an interest in the benefits of any sewer line, was proven.**

### Third Assignment of Error

**The trial court plainly erred in admitting during the State's case in chief local Wapakoneta ordinances that do not apply to Stinebaugh's situation.  Relatedly, appellant's trial counsel rendered ineffective assistance of counsel in handling this issue and in failing to properly argue for acquittals under Criminal Rule 29.**

---

[3] The jury did not come to an agreement as to the value of the property or services that was stolen.  Doc. 115. For this reason, the conviction was reduced from a third-degree felony to a fifth-degree felony.  Doc. 124.

Stinebaugh does not challenge the sufficiency of the evidence supporting his first-degree misdemeanor convictions on appeal.

*First Assignment of Error*

**{¶18}** Stinebaugh asserts that his conviction for having an unlawful interest in a public contract is not supported by sufficient evidence.

Legal Standard

**{¶19}** A challenge to the sufficiency of the evidence "addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact" and, therefore, whether the evidence can support the verdict. *State v. Barga*, 2018-Ohio-2804, ¶ 8 (3d Dist.). Thus, appellate courts are "not to examine whether the evidence presented should be believed but should rather 'examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Wilson*, 2022-Ohio-504, ¶ 57 (3d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 274 (1991), *superseded by state constitutional amendment on other grounds*.

> On appeal, the applicable standard of review 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.'

*State v. Gear*, 2023-Ohio-1246, ¶ 14 (3d Dist.), quoting *State v. Plott*, 2017-Ohio-38, ¶ 62 (3d Dist.).

**{¶20}** Ohio's ethics law addresses public contracts in R.C. 2921.42. This provision reads, in its relevant part, as follows:

(A)  No public official shall knowingly do any of the following:

(1)  Authorize, or employ the authority or influence of the public official's office to secure authorization of any public contract in which the public official, a member of the public official's family, or any of the public official's business associates has *an interest*;

* * *

(3)  During the public official's term of office or within one year thereafter, occupy any *position of profit in the prosecution of a public contract* authorized by the public official or by a legislative body, commission, or board of which the public official was a member at the time of authorization, unless the contract was let by competitive bidding to the lowest and best bidder;

(4)  Have an *interest in the profits or benefits of a public contract* entered into by or for the use of the political subdivision or governmental agency or instrumentality with which the public official is connected;

* * *

(Emphasis added).  A violation of R.C. 2921.42(A)(1) is a fourth-degree felony while a violation of R.C. 2921.42(A)(3) or R.C. 2921.42(A)(4) is a first-degree misdemeanor.  R.C. 2921.42(E).

**{¶21}** Further, R.C. 102.03(D) contains one of Ohio's conflicts of interest laws and reads as follows:

No public official or employee shall use or authorize the use of the authority or influence of office or employment *to secure anything of value* or the promise or offer of anything of value that is of such a

character as to manifest a substantial and improper influence upon the
public official or employee with respect to that person's duties.

(Emphasis added.) A violation of R.C. 102.03(D) is a first-degree misdemeanor.
R.C. 102.99(B).

Legal Analysis

**{¶22}** In this appeal, the issue is not whether Stinebaugh acted appropriately
with regard to the extension of the public sanitary sewer line. Rather, the issue is
whether the State presented evidence at trial that establishes Stinebaugh's conduct
met the specific elements of the offense defined in R.C. 2921.42(A)(1). To establish
a conviction for having an unlawful interest in a public contract in violation of R.C.
2921.42(A)(1), the State must prove that a "[1] public official * * * [2] knowingly
authorize[d] or employ[e]d the authority or influence of the public official's office
[3] to secure authorization of any public contract [4] in which the public official, a
member of the public official's family, or any of the public official's business
associates [5] ha[d] an interest." R.C. 2921.42(A)(1). OEC Adv. Op. 2001-02 (Feb.
23, 2001). On appeal, Stinebaugh argues that the State failed to prove the fifth
element of this offense.[4]

**{¶23}** To support this assertion, Stinebaugh notes that the contract at issue
was between the city and Schaub Excavating. He points out that he was not a party

[4] Since no evidence was presented that suggests a member of Stinebaugh's family or one of his business
associates may have had a prohibited interest in the contract, we will limit our analysis to whether he had an
interest in the contract within the meaning of R.C. 2921.42(A)(1).

to the contract and was not affiliated with Schaub Excavating. Stinebaugh also points out that R.C. 2921.42(A)(1) prohibits a public official from having "an interest" in a public contract while R.C. 2921.42(A)(4) prohibits a public official from "[h]av[ing] an interest in the profits or benefits of a public contract." He argues that this distinction is important as a violation of R.C. 2921.42(A)(1) is a felony and a violation of R.C. 2921.42(A)(4) is a misdemeanor. Stinebaugh asserts that, "at most, [he] * * * had an interest in [a] * * * conceivable *benefit*" of the contract. (Emphasis sic.) Appellant's Brief, 12.

{¶24} In interpreting R.C. 2921.42(A), courts have turned to the opinions of the Ohio Ethics Commission ("OEC") as a source of persuasive authority. *State v. Hunter*, 2016-Ohio-123, ¶ 19 (1st Dist.); *State v. Mieczkowsk*, 2018-Ohio-2775, ¶ 23 (7th Dist.); *State v. Rosseau*, 2004-Ohio-5949, ¶ 14 (9th Dist.). *See State v. Urbin*, 2003-Ohio-5549, ¶ 4 (Moyer, C.J., concurring).

{¶25} In these opinions, the OEC has said that an "'interest' refers to a right or claim * * *." OEC, Adv. Op. 93-008 (May 21, 1993) (relying on several dictionary definitions of this term). To be prohibited by R.C. 2921.42(A), an interest "must be definite and direct and may be either pecuniary or fiduciary in nature." OEC, Adv. Op. 90-007 (May 14, 1990). *See State v. Urbin*, 2002-Ohio-3410, ¶ 15, (9th Dist.). "The determination of whether a public official or employee has an 'interest' in a public contract entered into by a governmental entity depends

upon the facts and circumstances of each particular situation." OEC, Adv. Op. 90-003 (Jan. 18, 1990).

{¶26} In Adv. Op. No. 92-013, the OEC considered whether a public official had an interest in drainage and sidewalk improvements that were conducted as part of a neighborhood revitalization program and that benefited a property that he owned. OEC, Adv. Op. 92-013 (Aug. 14, 1992). The OEC began by determining whether the public official had a prohibited interest under R.C. 2921.42(A), stating:

> [i]n this instance, the consideration or benefit is not being provided directly to the property owner and the property owner is not providing the service to the political subdivision or performing the work under the contract. The property owner does not have the same kind of interest in a political subdivision's public improvements as he does in a loan, or grant, or tax abatement that is awarded directly to him. The interest of a property owner who will benefit from an infrastructure improvement made by or for the use of his political subdivision as part of a neighborhood revitalization program is not direct for purposes of R.C. 2921.42.
>
> * * *
>
> While it is undisputed that property owners in an area of the village that will receive infrastructure improvements may benefit from the infrastructure improvements * * * and may have an 'indirect' interest in the public contract, no transaction exists between the village and the affected property owners * * * which would indicate that the property owners have a direct 'interest' in the public contract.

-13-

*Id.*[5]  The OEC then concluded that the public official in the situation it was

examining did not have a prohibited interest under R.C. 2921.42(A)(1) and R.C.

2921.42(A)(4).  However, the OEC went on to give the following guidance:

> a public official may well be deemed to have *an interest in the profits or benefits* [R.C. 2921.42(A)(4)] or occupy a position in the prosecution of a public contract [R.C. 2921.42(A)(3)] in circumstances where the benefit to the council member's property is selective, differential, or in disproportion to the benefit provided to other property in the political subdivision or a portion thereof.

(Emphasis added.)  *Id.*  The OEC then proceeded to an analysis of R.C. 102.03(D),

which prohibits a public official from using his or her influence to "secure anything

of value."  The OEC stated that R.C. 102.03(D) "prohibits a public official from

participating in * * * matters which would provide a particular and definite

pecuniary benefit to property in which he has an interest."  OEC, Adv. Op. 92-013

(Aug. 14, 1992), citing OEC, Adv. Op. 88-004 (Apr. 7, 1988).  *See also* OEC, Adv.

Op. 98-002 (May 15, 1998); OEC, Adv. Op. 2018-02 (Oct. 31, 2018).

**{¶27}** We turn now to the facts of the case presently before us.  Since

Stinebaugh was charged under R.C. 2921.42(A)(1), the focus of our analysis will

be Stinebaugh's relationship to the public contract at issue.  As with the situation in

Adv. Op. 92-013, no evidence suggests Stinebaugh was a party to the contract,

---

[5] The OEC also noted that situations may arise in which a public official does not receive consideration under a contract but may still have an interest in the contract.  The OEC gave the examples of a public official acting as a subcontractor who performs work under the contract or a public official who receives a distributive share of the proceeds paid through the contract.  In these examples, the public official was "directly benefiting from the contract."  OEC, Adv. Op. 92-013 (Aug. 14, 1992).

received consideration through the contract, performed any work under the contract, or had any other connection with the transaction between the city and Schaub Excavating that could be considered direct to Stinebaugh. Thus, Stinebaugh had the type of interest that a property owner has in a political subdivision's infrastructure improvements rather than the type of interest that a property owner has in a loan, grant, or tax abatement received directly from a political subdivision.[6]

{¶28} In evaluating infrastructure projects, the OEC distinguished between infrastructure projects that provide a generalized benefit—such as a comprehensive neighborhood revitalization program—and infrastructure projects that confer a benefit to the public official that is "selective, differential, or in disproportion to the benefit provided to other property in the political subdivision * * *." OEC, Adv. Op. 92-013 (Aug. 14, 1992). In the case presently before us, the public sewer line was extended along an unimproved right-of-way and fitted with roughly fourteen taps. Tr. 576. These additional taps were installed for the purpose of benefiting any future homebuilder that might construct a house on one of the vacant lots alongside the extended public sewer line. Tr. 562-563.

{¶29} However, while others besides Stinebaugh would ostensibly reap the benefits of this public sewer line extension project, this situation is distinct from the

---

[6] The sewer line was installed in October of 2018. Tr. 539, 739. At the time of installation, Stinebaugh owned one parcel of land that sat alongside the extended sewer line. Tr. 622. He had owned two parcels of land, but he built a house on one of these parcels and transferred the deed to the homebuyer in July of 2018. Tr. 561, 621. Thus, at the time of the extension project, Stinebaugh was not the owner of the house that was connected to the extended sewer line. Rather, his purchaser was the property owner by this time. Tr. 379.

comprehensive neighborhood revitalization program described in Adv. Op. 92-013. In fact, this situation bears some resemblance to the OEC's example of selective, differential, or disproportionate benefits. In that example, the public official "owned a large tract of undeveloped land and was the only landowner in the political subdivision to receive the improvements." OEC, Adv. Op. 92-013 (Aug. 14, 1992).

{¶30} In this case, the primary objective of this project was apparently to confer a benefit on the lot where Stinebaugh had constructed a house. At trial, Ruck testified that another person requested the city to pay for the installation of a sewer line in the same area as the house Stinebaugh had constructed but was denied. Tr. 583. The evidence in the record also indicates that the extension of this sewer line to Stinebaugh's home build was a departure from the customary practices governing such projects in Wapakoneta.

{¶31} Even assuming that Stinebaugh received a selective, differential, or disproportionate benefit from the sewer line extension, he would, under the reasoning of the OEC, only "be deemed to have an *interest in the profits or benefits* or *occupy a position in the prosecution* of a public contract * * *." OEC, Adv. Op. 92-013 (Aug. 14, 1992). An interest in the profits or benefits of a public contract would implicate R.C. 2921.42(A)(4) while occupying a position in the prosecution of a public contract would implicate R.C. 2921.42(A)(3). Further, in Adv. Op. 92-013, the OEC also noted that a public official's participation in a decision to approve

an infrastructure project under which he or she would realize a benefit could constitute a conflict of interest that violates R.C. 102.03(D).[7]

{¶32} However, the OEC does not suggest that a selective, differential, or disproportionate benefit in an infrastructure project would give a public official a definite and direct interest in the contract as required by R.C. 2921.42(A)(1). Rather, the OEC describes a public official with a selective, differential, or disproportionate benefit as "hav[ing] a definite and direct interest in, and profit from, *the improvements*." OEC, Adv. Op. 92-013 (Aug. 14, 1992). Thus, the public official may come to have an interest in the improvements as the profits or benefits of the public contract, but this does not mean that the public official has an interest in the contract itself. Without such an interest in the contract, a defendant cannot be found guilty of violating R.C. 2921.42(A)(1). If the State had charged Stinebaugh with a violation of R.C. 2921.42(A)(3) or R.C. 2921.42(A)(4), a different result may have been obtained. Since we do not have that case before us, we do not decide that question.

{¶33} In summary, no evidence in the record establishes that Stinebaugh had a right or claim under the contract that was both definite and direct. Thus, the State failed to establish that he had a prohibited interest that falls within the meaning of R.C. 2921.42(A)(1). Because the evidence does not establish an essential element

---

[7] In this case, Stinebaugh was convicted of violating R.C. 102.03(D) as the result of his actions with regard to the public sewer line extension project. This conviction is not challenged on appeal.

of the charged offense, Stinebaugh's conviction for having an unlawful interest in a public contract in violation of R.C. 2921.42(A)(1) is reversed. Accordingly, the first assignment of error is sustained.

*Second Assignment of Error*

{¶34} Stinebaugh argues that the predicate offense for his conviction for theft in office is not supported by sufficient evidence.

Legal Standard

{¶35} We reincorporate the legal standard governing sufficiency-of-the-evidence challenges as set forth under the first assignment of error. To establish a conviction for theft in office in violation of R.C. 2921.41(A)(1), the State must prove that a "[1] public official * * * [2] committ[ed] any theft offense, as defined in" R.C. 2913.01(K), [3] and "use[d his or her] * * * office in aid of committing the offense or assent[ed] to its use in the aid of committing the offense[.]" The definition of theft offenses in R.C. 2913.01(K) includes violations of R.C. 2913.02(A)(1).[8] To prove a defendant committed the offense of theft in violation of R.C. 2913.02(A)(1), the State must establish that he or she, "[1] with purpose to deprive the owner of property or services, * * * [2] knowingly [3] obtain[ed] or exert[ed] control over either the property or services * * * [4] [w]ithout the consent of the owner or person authorized to give consent[.]"

---

[8] The jury instructions specified that R.C. 2913.02(A)(1) was the theft offense that Stinebaugh was alleged to have committed as part of the theft in office charge. Tr. 1066. *See also* Tr. 991. *See State v. Dobbins*, 2011-Ohio-6777, ¶ 18-19, 23-25 (4th Dist.); *State v. Forbush*, 1991 WL 131515, *2 (9th Dist. July 17, 1991).

Legal Analysis

**{¶36}** The State's theory underlying this theft charge rests on three key assertions.  First, the State asserts that Wapakoneta Codified Ordinance 1248.07(a) required Stinebaugh, as a subdivider, to bear the costs of extending the public sewer line.  Second, because this requirement is in an ordinance, the State asserts that "only city council had the authority to consent" to an expenditure in which the city—rather than the subdivider—bore the costs of extending a public sewer line.  Appellant's Brief, 9.  Third, since Stinebaugh did not seek city council's approval for the use of public funds on this infrastructure project, the State argues Stinebaugh committed theft in violation of R.C. 2913.02(A)(1) by failing to obtain the consent of the "only" entity authorized to consent to an expenditure that contravened an ordinance.  *Id.* Tr. 991, 1038, 1066.  We will examine each of these three assertions to determine whether the State proved that Stinebaugh violated R.C. 2913.02(A)(1).

**{¶37}** First, we examine whether the ordinance identified by the State required Stinebaugh to bear the costs of extending the public sewer line.  The interpretation of an ordinance presents a question of law and is reviewed de novo on appeal.  *State v. Frey*, 2006-Ohio-2452, ¶ 9 (4th Dist.).  Under a de novo standard, the appellate court conducts an independent review of the matter, giving no

-19-

deference to the interpretation reached by the trial court.[9] *State v. Vaduva*, 2016-Ohio-3362, ¶ 19 (2d Dist.); *State v. Mason*, 2016-Ohio-8400, ¶ 17 (3d Dist.).

**{¶38}** Further, "[o]ne important rule for interpretation of legislation is that in a criminal case any ambiguity must be resolved in favor of the accused." *State v. Vultee*, 1994 WL 237484, *4 (2d Dist. June 3, 1994). "Ordinances defining offenses or penalties shall be strictly construed against the city and liberally construed in favor of the accused." *Highland Hts. v. Grischkan*, 133 Ohio App.3d 329, 334 (8th Dist. 1999). Further, "ambiguity in a criminal statute is construed strictly so as to apply the statute only to conduct that is clearly proscribed." *State v. Elmore*, 2009-Ohio-3478, ¶ 38.[10]

**{¶39}** The State argues that Stinebaugh did not do what was required by Wapakoneta Cod. Ord. 1248.07(a).[11] This provision reads as follows:

> Public Sanitary Sewers; Extensions. If a subdivision can be reasonably served by the extension of an existing public sanitary sewer, as determined by the Planning Commission, the subdivider or developer shall provide a system of sanitary sewer mains and shall provide lateral connections for each lot. Where a public sanitary sewer is not reasonably accessible, the subdivider, the owner or the

---

[9] The trial court did not provide the jury with any instructions regarding what legal requirements are contained in Wapakoneta Cod. Ord. 1248.07(a).

[10] We recognize that the provision identified by the State is not a criminal ordinance. *See* Wapakoneta Cod. Ord. 606.04(a). However, the State is using this ordinance to define Stinebaugh's conduct as constituting a felonious theft offense in a criminal prosecution. For this reason, we will strictly construe any ambiguities in these provisions in favor of the criminal defendant. *State v. Mollohan*, 1999 WL 671824, *5 (Aug. 19, 1999) (4th Dist.) (holding that the law contains a "general theoretical framework which mandates that ambiguities or anomalies in criminal cases should operate in favor of the accused").

[11] The State also introduced Wapakoneta Cod. Ord. 1244.04(b) at trial. Stinebaugh asserts that this provision outlines inapplicable platting procedures and mentions developers rather than subdividers. This provision describes what is necessary in the platting process after a "developer has constructed the required water and sanitary sewer facilities * * *." Wapakoneta Cod. Ord. 1244.04(b). Even if this provision were applicable, what sanitary sewer facilities are "required" would still be defined in Wapakoneta Cod. Ord. 1248.07(a).

developer may provide septic tanks for each lot, provided that the septic tanks are installed in accordance with State and/or County Board of Health requirements. Whenever main lines are installed, sewer and water mains shall be extended to property lines of the subdivision. Connections to public sanitary sewer lines shall be subject to the approval of and according to the specifications of, the Director of Public Service and Safety or the County Sanitary Engineer, depending upon jurisdiction.[12]

Three sets of words are used in this provision to describe the different components of the sanitation infrastructure: (1) public sanitary sewer line; (2) sanitary sewer mains or main lines; and (3) lateral connections.[13]

{¶40} The language of this ordinance clearly requires a subdivider[14] to provide a system of "sanitary sewer mains" within the subdivision. This ordinance also clearly requires a subdivider to provide "lateral connections" that integrate each of the lots in the subdivision into the system of "sanitary sewer mains." This provision then indicates that "an existing public sewer line" is to be extended from its location and connected to the system of "sanitary sewer mains" constructed inside the subdivision. However, this ordinance does not state who is responsible for "the extension of [the] * * * existing public sanitary sewer." Wapakoneta Cod. Ord. 1248.07(a).

---

[12] Wapakoneta Cod. Ord. 1220.01 states that the planning commission is to be comprised of the mayor, the director of public service and safety, and three citizens of the city who are appointed by the mayor. R.C. 713.03 states that the planning commission shall also serve as the platting commission.

[13] Part Twelve of the ordinances does not provide any definitions for these terms. Wapakoneta Cod. Ord. 1040.02(nn) does define a "public sewer" as "a sewer owned and operated by a public authority."

[14] Wapakoneta Codified Ordinances 1240.09(s) and 1240.09(t) provide definitions for "subdivider" and "subdivision." On appeal, Stinebaugh asserts that he does not fall within these definitions. *See also* Tr. 977-978. At trial, he did admit that he subdivided a parcel of land into two lots at 708 and 710 Fairview Drive. Tr. 971-972. We need not consider this argument to dispose of this case.

{¶41} The language of this provision does not state that the subidivider is responsible for extending the existing public sanitary sewer line from a location outside of the subdivision to the property line of the subdivision. Similarly, this provision also does not hold the subdivider responsible for the costs of extending an existing public sanitary sewer line in such a situation. While this ordinance expressly requires the subdivider to provide "lateral connections" and a "system of sanitary sewer mains," it nowhere states that the subdivider is required to provide for the extension of the "public sanitary sewer line" to the subdivision.

{¶42} Further, under the wording of this provision, the subdivider's responsibilities do not appear to extend beyond the property lines of the subdivision. The ordinance at issue requires the mains in the sanitary sewer system to be run to the "property lines of the subdivision." Wapakoneta Cod. Ord. 1248.07(a). The requirement appears to exist to facilitate a connection at the property line of the subdivision between the sanitary sewer mains installed within the subdivision and an existing public sanitary sewer line that lies outside of the subdivision. Since the subdivider is made responsible for providing the system of sanitary sewer mains that connect the lots inside the subdivision, the subdivider would apparently be the party responsible for running the requisite sanitary sewer mains to the inside property lines of the subdivision.

{¶43} Importantly, this provision only requires the requisite sewer mains in the sanitary system within the subdivision to be run to the property lines of the

subdivision. Thus, the subdivider is not, by this ordinance, required to extend a sanitary sewer main beyond the property lines of the subdivision and to the location of any existing public sanitary sewer line that lies outside of the subdivision. This provision also contains no language that requires a subdivider to extend the existing public sanitary sewer line from its location outside the subdivision to the property line of the subdivision. For these reasons, we conclude that, contrary to the State's first assertion, Wapakoneta Cod. Ord. 1248.07(a) does not require a subdivider to provide for the extension of a public sanitary sewer line.

{¶44} Turning to the facts of this case, the record contains no indication that Stinebaugh failed to provide the "sanitary sewer mains" or "lateral connections" for the two lots comprising his "subdivision." Tr. 369, 378, 946. Given the small size of this subdivision, the sanitary sewer system was minimal and appears only to have involved running a lateral connection from the house to where the public sewer line had been extended along the city's unimproved right-of-way.

{¶45} Ruck testified at trial that the public sanitary sewer line extension was entirely located on the unimproved right-of-way that was owned by the city and did not cross into the property at 708 Fairview Drive. Tr. 564-565. Thus, even assuming that he qualifies as a subdivider, Stinebaugh appears to have covered the costs that Wapakoneta Cod. Ord. 1248.07(a) required him to bear. Since this provision did not require the subdivider to bear the costs of extending the public

sanitary sewer line, the State did not establish that Stinebaugh failed to provide what was expressly required by the identified ordinance.

**{¶46}** Before turning to the State's second assertion, we note that the State also introduced testimony that described the local, customary practices regarding the extension of public sewer lines to subdivisions. Tr. 339, 352, 366, 430, 506, 511, 534-536, 546, 583. *But see* Tr. 379, 383. This testimony indicated that the developer or subdivider typically provided for the extension of the public sewer line to the subdivision. Tr. 339. Once completed, the extended public sewer line would then be turned over to the city. Tr. 339. However, as discussed in our prior analysis, the legislative body of the municipality did not make this customary practice mandatory in the text of Wapakoneta Cod. Ord. 1248.07(a).[15]

**{¶47}** In closing arguments the State referred to the previous instances in which this customary practice was followed as "the common law * * *." Tr. 1038. But this custom was not legally binding. Acting in contravention of custom is not equivalent to acting in contravention of the law.

> All crimes in Ohio must be based upon either legislative enactments of the state or on ordinances enacted pursuant to the authority granted to municipal corporations and an act to be punishable as a crime must be specifically embraced within the terms of some enactment. Broadly defined, a crime is an act prohibited by a legislative enactment for the violation of which a penalty is provided.

---

[15] Scott indicated at trial that he believed that the municipal ordinances required a subdivider to cover the costs of a public sewer line extension. Tr. 339. However, we review the text of an ordinance de novo and, in the context of this criminal case, do not conclude that Wapakoneta Cod. Ord. 1248.07(a) clearly requires a subdivder to bear this cost. *Frey*, *supra*, at ¶ 9.

*City of St. Marys v. Huber*, 1981 WL 6700, *1 (3d Dist. Oct. 28, 1981). In determining whether city council's consent was required in this case, custom is not a substitute for the law. This Court will not affirm a conviction if the State only established that the city council did not consent to a deviation from a local custom. The State had to establish that Stinebaugh violated a binding law.

**{¶48}** We turn now to examining the State's second assertion that only city council could consent to the expenditure at issue. We begin this analysis by looking at what authority the municipal ordinances gave to the safety service director. Wapakoneta Cod. Ord. 208.03 contains the following provision:

> The Director of Public Service and Safety is hereby authorized to execute public contracts for the purchase of supplies, materials or labor as provided in Ohio R.C. 735.05.

The version of R.C. 735.05[16] that was in effect at the time of the alleged offenses reads, in its relevant part, as follows:

> The director of public service may make any contract, purchase supplies or material, or provide labor for any work under the supervision of the department of public service involving not more than fifty thousand dollars. When an expenditure within the department, other than the compensation of persons employed in the department, exceeds fifty thousand dollars, the expenditure shall first be authorized and directed by ordinance of the city legislative authority. * * *

---

[16] This language is from a provision that was passed in Am. Sub. H.B. 509 and was effective on September 28, 2012. Further, Am. Sub. H.B. 33 amended this provision and took effect on October 3, 2023.

(Emphasis added.) These provisions specifically authorized the safety service director to expend a certain amount of money "for any work under the supervision of the department of public service." R.C. 735.05.

{¶49} In turn, Wapakoneta Cod. Ord. 242.03(a)(1)-(2) describes the responsibilities under the supervision of the safety service director as follows:

(a) Public Service Duties.

(1) The Director of Public Service and Safety shall manage and supervise public works and undertakings of the City, except as otherwise provided by law.

(2) The Director shall supervise the improvement and repair of streets, avenues, alleys, lands, lanes, squares, wharves, docks, landings, market houses, bridges, viaducts, aqueducts, sidewalks, playgrounds, sewers, drains, ditches, culverts, ship channels, streams and watercourses, the lighting, sprinkling and cleaning of public places and the construction of public improvements and public works, except as otherwise provided by law.

*See also* R.C. 735.02. As previously noted, Wapakoneta Cod. Ord. 1248.07(a) does not expressly require the subdivider to cover the costs of extending a public sewer line and does not forbid the city from bearing the costs of extending an existing public sewer line.

{¶50} Rather, the wording of Wapakoneta Cod. Ord. 1248.07(a) leaves a degree of latitude in the arrangements that can be made between the city and the subdivider regarding the extension of existing public sewer lines. In the language used, the legislative body does not evince an intention to criminalize or prohibit an arrangement in which the city covers the costs of extending a public sewer line while

-26-

the subdivider provides for the sanitary sewer system within the boundaries of the subdivision.[17] Since such an arrangement is not prohibited, Wapakoneta Cod. Ord. 208.03 and R.C. 735.05 gives the safety service director the authority to approve an expenditure of up to $50,000.00 "for any work under the supervision of the department of public service." R.C. 735.05.

{¶51} Turning to the facts of the case before us, the contract between the city and Schaub Excavating was just over $13,000.00. Tr. 540. The evidence at trial clearly establishes that the safety service director signed and approved the purchase order for this extension project. Ex. 25. Further, the safety service director apparently exercised the authority given to him under Wapakoneta Cod. Ord. 208.03 because the project he approved extended the public sewer line far beyond what was necessary to service the house that Stinebaugh had built. The public sewer line extension had roughly fourteen taps that were put in place to accommodate future builders who might construct houses on the other vacant lots along this unimproved right-of-way. Tr. 562-563, 576.

{¶52} The municipal ordinances do not suggest that the safety service director needed the consent of the city council to approve the extension of the public sewer line and the installation of these additional taps. Those who approved the

---

[17] We note that Wapakoneta Cod. Ord. 202.99 indicates that the failure to perform an act required by the ordinances constitutes a minor misdemeanor unless another penalty is provided. Thus, even if Stinebaugh had been required to extend the public sewer line, the legislative body has evinced an intention for such failure to be treated as a minor misdemeanor.

extension of the public sewer line beyond Stinebaugh's house were not alleged to have committed a theft offense because they authorized this expenditure without a subdivider or developer paying for this portion of the public sewer line.[18]  Rather, Wapakoneta Cod. Ord. 208.03 and R.C. 735.05 indicate that the safety service director had the authority to install these additional taps and extend the sewer line beyond what was necessary to simply service the house that Stinebaugh had built.

{¶53} In arguing that only city council could consent to the expenditure of funds for a public sewer line extension project, the State does not address the authority conferred on the safety service director by Wapakoneta Cod. Ord. 208.03 or R.C. 735.05 in its brief.  Rather, the State simply points out that Scott was terminated as safety service director several months after he told Stinebaugh that he did not believe it was proper for the city to undertake the extension project.  Tr. 342.

{¶54} Ruck testified that her boss, the new safety service director, instructed her to move forward with the extension project.  Tr. 538, 553.  She then testified that, while she did not agree with this decision, she acquiesced because the mayor "could fire you if he wants to."  Tr. 538.  Based on this testimony, the State asserts that "there was no consent given" and that this situation is like "a robber claiming the victim consented to giving him money without mentioning he was holding a gun."  Appellant's Brief, 10.

---

[18] We note that Ruck testified that the city never attempted to bill Stinebaugh for this expenditure.  Tr. 575.

{¶55} As an initial matter, we note that, while Ruck signed and submitted the purchase order to the safety service director, the testimony at trial does not establish that she was the person ultimately authorized to give consent to this expenditure within the meaning of R.C. 2913.02(A)(1). Tr. 341, 506, 538-541, 566-567. Since the State did not call the new safety service director to testify, the evidence produced at trial does not contain testimony about the factors that influenced the decision-making process of the person who was authorized to consent to the expenditure of these funds.[19]

{¶56} We also note that the State's line of argument suggests that pursuing a prosecution pursuant to R.C. 2913.02(A)(4) or R.C. 2913.02(A)(5) may have been more appropriate than pursuing one under R.C. 2913.02(A)(1). The provision defining theft reads as follows:

> (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
>
> (1) Without the consent of the owner or person authorized to give consent;
>
> (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
>
> (3) By deception;

---

[19]Stinebaugh contends that the city auditor's signature on the purchase order with Schaub Excavating constituted approval of the sewer line extension project by a disinterested elected city official. However, there is nothing in the record indicating the city auditor had independent authority to approve or disapprove city projects. On the contrary, the city auditor's signature on the purchase order merely indicated there were funds available to pay the contract price. This is evidenced by the notation juxtaposed to the city auditor's signature on the purchase order. Ex. 25.

(4) *By threat*;

(5) *By intimidation*;

(Emphasis added). R.C. 2913.02(A). The five subsections are "mutually exclusive" and are to be "read in the disjunctive."[20] 29B Ohio Jur.3d, Criminal Law, § 781 (2024), quoting *State v. Dugger*, 49 Ohio App. 2d 220 (9th Dist. 1975), at the syllabus. Further, a "threat" has been defined as

> [a] communicated intent to inflict harm or loss on another * * *, [especially] one that might diminish a person's freedom to act voluntarily or with lawful consent; a declaration, express or implied, of an intent to inflict loss or pain on another[.]

*State v. Myers*, 2022-Ohio-991, ¶ 8 (9th Dist.), quoting Black's Law Dictionary (11th Ed. 2019). *See also Ohio Jury Instructions*, CR § 513.02 (Rev. Jan. 9, 2016). Similarly, "intimidation" has been defined as the "act of frightening, scaring, or bullying." *Id.*

**{¶57}** But in this case, the State sought to produce evidence that was directed at establishing a violation of R.C. 2913.02(A)(1) and ultimately failed to establish that this expenditure was not approved by a person authorized to give consent. If the State had built a case that was aimed at establishing a violation of R.C. 2913.02(A)(4) or R.C. 2913.02(A)(5), a different result may have been obtained.

---

[20] This does not mean that the State was limited to pursuing a conviction under only one of the subsections in R.C. 2913.02(A). The jury could have been presented with instructions on multiple subsections. *Wilson*, *supra*, at ¶ 34. But in this case, the jury was only instructed on R.C. 2913.02(A)(1). Tr. 1066. *Dobbins*, *supra*, at ¶ 23 *Forbush*, *supra*, at *2.

*State v. Wilson*, 2002-Ohio-4709, ¶ 32-36 (12th Dist.). Since we do not have that case before us, we do not decide that question. *Dobbins*, *supra*, at ¶ 23-25.

**{¶58}** In short, Wapakoneta Cod. Ord. 1248.07(a) does not prohibit an arrangement in which the city—rather than the subdivider—bears the cost of extending a public sewer line to a subdivision while Wapakoneta Cod. Ord. 208.03 authorizes the safety service director to consent to expenditures of up to $50,000.00 "for any work under the supervision of the department of public service." R.C. 735.05. Given these provisions, the State has failed to establish its second assertion that "only city council had the authority to consent" to the expenditure of funds for the extension of the public sewer line. Appellant's Brief, 9.

**{¶59}** We turn to the State's third assertion that Stinebaugh committed theft in violation of R.C. 2913.02(A)(1) by failing to obtain the consent that only city council could provide to an expenditure that conflicted with the requirements of an ordinance. However, in examining the State's first assertion, we concluded that Wapakoneta Cod. Ord. 1248.07(a) did not require a subdivider to bear the costs of extending the public sewer line. Thus, the State did not establish that this expenditure was made in contravention of an ordinance

**{¶60}** Further, in examining the State's second assertion, we concluded that Wapakoneta Cod. Ord. 208.03 authorized the safety service director to expend up to $50,000.00 "for any work under the supervision of the department of public service." R.C. 735.05. Since the expenditure at issue was approved by the safety

service director, this expenditure was approved by a person authorized to give consent. For this reason, the State has failed to establish that this expenditure was made "without the consent of the owner or person authorized to give consent[.]" R.C. 2913.02(A)(1). Because the State failed to establish the first two assertions, the third assertion—that Stinebaugh violated R.C. 2913.02(A)(1) by not obtaining the consent of city council—must also fail.

{¶61} In conclusion, the jury trial proceeded under R.C. 2913.02(A)(1), and the State failed to prove that Stinebaugh violated that provision. Tr. 1066. *State v. Lusher*, 2012-Ohio-5526, ¶ 40-45 (4th Dist.). Since the State failed to establish an element of the predicate offense of theft in violation of R.C. 2913.02(A)(1), Stinebaugh's conviction for theft in public office in violation of R.C. 2921.41(A)(1) is not supported by sufficient evidence. While his conviction for theft in public office is reversed, he still remains convicted of having a conflict of interest in violation of R.C. 102.03(D) for his actions with regard to the extension of the public sewer line. The second assignment of error is sustained.

*Third Assignment of Error*

{¶62} Stinebaugh argues that defense counsel was ineffective for failing to object to the admission of several local municipal ordinances at trial and for failing to raise adequate arguments in support of the Crim.R. 29 motions.

## Legal Standard

**{¶63}** Ohio law presumes that the representation provided by a licensed attorney is competent. *State v. Passmore*, 2023-Ohio-3209, ¶ 53 (3d Dist.). For this reason, the burden of establishing an ineffective assistance of counsel claim rests on the appellant. *State v. Cartlidge*, 2020-Ohio-3615, ¶ 39 (3d Dist.). The appellant must establish (1) that trial counsel's performance was deficient and (2) that such performance prejudiced the Defense. *State v. Dendinger*, 2023-Ohio-4255, ¶ 24 (3d Dist.).

**{¶64}** To establish deficient performance, the appellant must demonstrate that trial counsel's representation was not objectively reasonable and made errors of such seriousness that he or she was not functioning as the counsel guaranteed by the Constitution. *State v. Lloyd*, 2022-Ohio-4259, ¶ 16. Matters that fall within the realm of debatable trial tactics and strategies are generally insufficient to establish deficient performance. *State v. Grant*, 2023-Ohio-2720, ¶ 55 (3d Dist.). To establish prejudice, the appellant must demonstrate that, in the absence of counsel's error, a reasonable probability exists that the outcome of the proceeding would have been different. *State v. Berry*, 2021-Ohio-1132, ¶ 122 (3d Dist.).

## Legal Analysis

**{¶65}** Stinebaugh raises two arguments to establish that he was deprived of his right to the effective assistance of counsel. First, he argues that trial counsel should have challenged the admission of several provisions from the Wapakoneta

Codified Ordinances that addressed the extension of public sewer lines and the installation of a sanitary sewer system in a subdivision. Stinebaugh asserts that these provisions were irrelevant. As an initial matter, the decision not to object falls within the realm of trial strategy and does not generally constitute deficient performance. *State v. Harvey*, 2020-Ohio-329, ¶ 58 (3d Dist.).

**{¶66}** Further, the State introduced an abundance of testimony at trial that described the customary responsibilities of subdividers regarding the extension of existing public sewer lines. Tr. 339. But when properly construed, the text of Wapakoneta Cod. Ord. 1248.07(a) does not make this customary practice mandatory. Thus, the text of this ordinance provides one of Stinebaugh's strongest rebuttals to the testimony about the local practices in the City of Wapakoneta. Accordingly, we conclude that the failure to object to the admission of these ordinances should be classed as a matter of trial strategy. Given the abundant testimony about the customary practices surrounding the extension of public sewer lines, we also do not conclude that the absence of the written ordinances at trial would have made a difference in the outcome of this proceeding.

**{¶67}** Stinebaugh also argues that the admission of this local ordinance constituted plain error. However, "the prejudice standards for plain-error and ineffective-assistance-of-counsel claims are the same[.]" *State v. Alexander*, 2023-Ohio-123, ¶ 27 (3d Dist.). Since Stinebaugh failed to establish the prejudice under the standard for ineffective assistance of counsel claims, he cannot establish

prejudice under the plain error standard. Accordingly, his arguments under the plain error standard are without merit.

{¶68} Second, Stinebaugh argues that defense counsel was ineffective for failing to raise better arguments in support of the Crim.R. 29 motions that were made at trial. In this case, defense counsel made a Crim.R. 29 motion as to each of the charges against Stinebaugh at the close of the State's case-in-chief and then renewed these motions for acquittal when the Defense rested. Tr. 656-657, 659, 988. When making these motions, defense counsel raised specific arguments for some but not all of the eleven charges against Stinebaugh. Tr. 656-659.

{¶69} On appeal, Stinebaugh "directs us to no authority requiring counsel to offer or explain his reasons for making a Crim.R. 29 motion for acquittal." *State v. Payne*, 2019-Ohio-4218, ¶ 27 (9th Dist.). The decision to "argue the merits [of a Crim.R. 29 motion] broadly as opposed to making specific arguments relative to each and every count [in the indictment] is a matter of sound trial strategy." *State v. Salti*, 2019-Ohio-149, ¶ 80 (8th Dist.). Thus, the fact that appellate counsel would have argued the Crim.R. 29 motion differently does not mean that trial counsel's performance was deficient. *See also State v. Moody*, 2010-Ohio-3272, ¶ 18 (5th Dist.); *State v. Haber*, 2008-Ohio-3991, ¶ 20 (11th Dist.); *State v. Ramsey*, 2022-Ohio-3389, ¶ 44 (12th Dist.).

{¶70} Further, the trial court denied the Crim.R. 29 motions that trial counsel made as to all eleven charges against Stinebaugh. On appeal, Stinebaugh did not

raise any argument establishing that this ruling would have been different had trial counsel elaborated on his arguments for the Crim.R. 29 motion. Since he cannot demonstrate prejudice, this second argument is without merit. In conclusion, Stinebaugh has failed to carry the burden of establishing his ineffective assistance of counsel claims. Accordingly, the third assignment of error is overruled.

*Conclusion*

**{¶71}** Having found no error prejudicial to the appellant in the particulars assigned and argued in the third assignment of error, the judgment of the Auglaize County Court of Common Pleas is affirmed in part. Having found error prejudicial to the appellant in the particulars assigned and argued in the first and second assignments of error, the judgment of the Auglaize County Court of Common Pleas is reversed in part.

**{¶72}** While his three convictions for conflict of interest in violation of R.C. 102.03(D) are unaffected by this decision, we vacate Stinebaugh's convictions for having an unlawful interest in a public contract in violation of R.C. 2921.42(A)(1) and theft in public office in violation of R.C. 2921.41(A)(1). This cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment Affirmed in Part*
*Reversed in Part*
*And Cause Remanded*

**MILLER, J., concurs.**

**WALDICK, J., concurs in part and dissents in part.**

{¶73} I concur with the majority regarding its conclusions as to the first and third assignments of error. However, I respectfully dissent from the majority's assessment of the second assignment of error. In sustaining the second assignment of error, the majority's holding is contradictory to the evidence presented at trial and to the plain language of the ordinance at issue, which required Stinebaugh to fund the extension of the sanitary sewer main that, once installed, provided sewer service to the real property he owned and developed. I would analyze and resolve the second assignment of error as follows.

### Second Assignment of Error

**Stinebaugh's fifth-degree felony conviction under R.C. 2921.41(A)(1) is erroneous as a matter of law on insufficiency grounds because the City of Wapakoneta has the authority to install sewer lines in the public right-of-way and three appropriate city officials – including the independently elected city auditor – consented to the sewer line extension. Thus, no predicate theft offense, which is necessarily distinct from having an interest in the benefits of any sewer line, was proven.**

{¶74} At issue in the second assignment of error is Stinebaugh's conviction and sentence on Count 17 of the indictment for Theft in Office in violation of R.C. 2921.41(A)(1). Stinebaugh asserts that the evidence presented as to Count 17 was insufficient to support his conviction for Theft in Office, specifically as to the predicate theft offense necessary to prove the crime at issue.

**{¶75}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259 (1991), paragraph two of the syllabus. Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.).

**{¶76}** R.C. 2921.41 defines the offense of Theft in Office, and provides in relevant part:

> (A) No public official or party official shall commit any theft offense, as defined in division (K) of section 2913.01 of the Revised Code, when * * * the following applies:

> (1) The offender uses the offender's office in aid of committing the offense or permits or assents to its use in aid of committing the offense[.]

**{¶77}** In this case, the predicate "theft offense" for the Theft in Office charge was Theft in violation of R.C. 2913.02. R.C. 2913.02 defines the crime of theft, and provides:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

(4) By threat;

(5) By intimidation.

{¶78} At trial in this matter, the State of Ohio's theory of the case as to Count 17 was that Stinebaugh had committed Theft in violation of R.C. 2913.02(A)(1). It was upon that subsection of the theft statute that the jury was instructed and therefore, ultimately, found Stinebaugh to be guilty. Accordingly, Stinebaugh's challenge to his Theft in Office conviction on a sufficiency-of-the-evidence basis must be analyzed by reviewing the evidence in the record offered by the prosecution to support its theory that Stinebaugh was guilty of Theft in violation of R.C. 2913.02(A)(1).

{¶79} In that respect, the evidence presented at trial was that in 2018, Stinebaugh contracted to build a house for a third party on a lot owned by Stinebaugh at 708 Fairview Drive in Wapakoneta. That lot was one of two contiguous lots that Stinebaugh owned on Fairview Drive, after having previously done a lot split of a single larger lot that he had purchased for development purposes.

At some point during the construction process of the house at 708 Fairview, Stinebaugh realized that there was no public sewer line in place to provide sewer service to that property.

**{¶80}** Prosecution witness Chad Scott began serving as the City of Wapakoneta's Safety Service Director in January of 2016, when he was hired by Stinebaugh in his new capacity as mayor. Scott held that position for two and a half years. As Safety Service Director, Scott was responsible for overseeing the police and fire departments, as well as the city's engineering, water, and sewer departments. In that position, Scott reported directly to the mayor.

**{¶81}** While working in that capacity, Scott became aware that Stinebaugh was building a spec home on a property he owned on Fairview and that there was no sewer available for the house to tie into. Stinebaugh approached Scott about the sewer issue. In that conversation, Stinebaugh said he was going to have the city run a sewer line to that property. In response, Scott told Stinebaugh that in the City of Wapakoneta, the developer installs the sanitary sewer line and then the city takes it over, as set forth in the codified ordinances of Wapakoneta, which provide that the developer is responsible for the installation of water and sewer.

**{¶82}** Scott testified that Stinebaugh did not like that answer, and the two had no further conversation about the matter. Just a few weeks after that conversation about the sewer issue, Scott was told by Stinebaugh that he was looking for someone to replace Scott as Safety Service Director. In early July of

2018, which was approximately two months after the conversation about the sewer issue, Stinebaugh texted Scott, who was on vacation at the time, and told him he was fired. While Scott's employment with Wapakoneta terminated at that time, he learned a few months after his departure that a sewer line had been installed by the city to serve Stinebaugh's property.

{¶83} Scott testified that, in instances such as the one at issue here, if one follows the Wapakoneta codified ordinances, there is a permitting process for developers to provide the city with engineering plans and other such information about what they plan to do when installing a sewer line. Scott also identified State's Exhibit 28 as a copy of Wapakoneta Codified Ordinance 1244.04, which addresses platting procedure.

{¶84} Section 1244.04 provides, in relevant part:

(a) Together with the final plat, the subdivider shall submit to the Planning Commission two copies of the complete set of construction drawings for public improvements as provided in Chapter 1248. These construction drawings shall include a cover sheet, street and utility improvement plans and grading and drainage plans for the subdivision. In addition, the subdivider shall be required to submit storm drainage calculations and a drainage area map showing individual and cumulative drainage areas tributary to each point of concentration.

(b) Following the City's formal approval of the final plat and accompanying detailed construction drawings as approved by the Director of Public Service and Safety, the developer shall be required to submit one reproducible copy of such construction drawings. Once the developer has constructed the required water and sanitary sewer facilities, he or she shall be required to submit to the City a set of

reproducible prints showing the as-built locations of the water, storm and sanitary sewer facilities, easements and any unusual conditions.

Scott also identified State's Exhibit 29, which was a copy of section 1248.07 of the Wapakoneta Codified Ordinances.

{¶85} Section 1248.07 provides in relevant part:

(a) *Public Sanitary Sewers; Extensions*. If a subdivision can be reasonably served by the extension of an existing public sanitary sewer, as determined by the Planning Commission, the subdivider or developer shall provide a system of sanitary sewer mains and shall provide lateral connections for each lot. Where a public sanitary sewer is not reasonably accessible, the subdivider, the owner or the developer may provide septic tanks for each lot, provided that the septic tanks are installed in accordance with State and/or County Board of Health requirements. Whenever main lines are installed, sewer and water mains shall be extended to property lines of the subdivision. Connections to public sanitary sewer lines shall be subject to the approval of and according to the specifications of, the Director of Public Service and Safety or the County Sanitary Engineer, depending upon jurisdiction.

{¶86} Scott testified that both of those ordinances were parts of Wapakoneta's city code requiring a developer to construct and pay for a sewer main. Scott also confirmed that, during his employment with the City of Wapakoneta, it was the practice there that the developer of a property would pay for the sewer main and Scott was aware of no time that a developer did not pay for a sewer main, other than the incident involving Stinebaugh.

{¶87} State's witness William "Whitey" Thomas served as the Supervisor of the Street Department, after having been appointed to that position by Stinebaugh in his capacity as mayor. Thomas testified that Stinebaugh approached him about

the lack of a sewer line to the property on Fairview where Stinebaugh was building a house. Stinebaugh had discovered that there was no sewer access unless he were to run a line across the road and tie into the sewer utilized by the mobile home park across the street.

**{¶88}** In that conversation, Thomas told Stinebaugh that running a sewer line for his property across to the mobile home park should not be done because Thomas believed the mobile home park had a private system and, also, to do so would be inconvenient and expensive for Stinebaugh. In response, Stinebaugh then asked if it was feasible to run a sewer line through a right of way owned by the city to the rear of Stinebaugh's property on Fairview. Thomas told Stinebaugh that the engineering department would have to get involved, and then an excavating company would perform the actual installation, both of which were subsequently done after Stinebaugh told Thomas that "we need to get a sewer in there." (Tr., 366).

**{¶89}** Thomas indicated that he worked to get the sewer extended to Stinebaugh's property because of Stinebaugh saying that is what needed to be done. Ultimately, Stinebaugh then tied into that sewer line extension for the house he was building for his private client. Thomas testified that had the city not paid to run the several hundred feet of extension necessary to reach Stinebaugh's property, Steinbaugh would have had to pay for the extension himself. When asked how such sewer projects work, Thomas testified that, as a rule, "[a]nybody that would develop

a property with a lot of houses, they could come in and put the sewer line in, the water line in, pave it, and then we took over the utilities." (*Id*.).

**{¶90}** Prosecution witness David Schlenker is a Wapakoneta native and owner of Schlenker Developments, a business that focuses on residential lot development, construction, and residential and commercial real estate management. Schlenker was acquainted with Stinebaugh as a result of both of them living in the same small town.

**{¶91}** At some point in 2018, Schlenker learned that Stinebaugh was building a home on Fairview, as a result of that being mentioned to Schlenker by Mike Schaub of Schaub Excavating, who was doing some work for Schlenker at the time. One day, Schlenker dropped off some paperwork to Schaub near the location of the property upon which Stinebaugh was building the house on Fairview, where Schaub was working on an extension of a main sanitary sewer line. At that time, Schaub mentioned that he was extending the sewer line at the city's direction, and that the city was paying for it. Schlenker found that to be unusual because, in his 29 years of experience in residential development in Wapakoneta, mainline sanitary sewer extensions were always paid for by the developer.

**{¶92}** As a result, Schlenker asked Stinebaugh about the sewer project at a later time, and Stinebaugh said the decision to extend the sewer line had been made by Mary Ruck, who was the Superintendent of the City Engineering Department. Following cross-examination, when defense counsel attempted to make a distinction

between developers of larger subdivisions and a person building a single home, Schlenker testified on redirect-examination that he was not aware of the city paying for a sewer line to go into any residential property in Wapakoneta.

{¶93} Prosecution witness Dennis Faller served as the City Law Director for Wapakoneta for over thirty-nine years, from June of 1980 until December 31, 2019. Faller testified that he was not aware of the sewer line having been run to Stinebaugh's property until after Stinebaugh was indicted.

{¶94} On the witness stand, Faller was asked what the proper legal procedure would be if a city ordinance required a developer to pay for a main sewer line but the developer was hoping to get the city to cover the cost. Faller answered, "Well, if there's legislation, council is the legislative body, so if there is legislation that dictates a result, then City Council would be the one that would ultimately say okay, we're not, – we're gonna [sic] change this or we're gonna [sic] make an exemption for that situation." (Tr., 481).

{¶95} Faller was also asked what the proper procedure would be if it was the common practice for a developer or person building a house to pay for the main sewer line going to the property and the builder wanted the city to pay for the line instead. Faller answered, "Typically, most people, in my experience as being Law Director, when those things would come up, most peoples' first contact might be with our Engineering Department. And then, you know, the Engineering Department would look at the situation and if it was something that was outside

what is the normal course of events, they wouldn't be the arbiter on that. And then if it would be presented to Council again, full council, once something's presented to them, my experience is if it's something like that, they would generally then assign it to a committee who would have a meeting and meet with the people, discuss it, do some research and then make a recommendation in regard to that. Our department heads, over the years, were very conscientious about, you know, what their role was and what was expected of them in regard to following procedures in normal courses of business." (Tr. 482-483).

{¶96} Prosecution witness Mary Ruck worked in the City of Wapakoneta's Engineering Department for over thirty years before retiring in 2022. Prior to Stinebaugh taking office as mayor, Ruck had been promoted to the position of Superintendent of Engineering and Zoning, in which job she oversaw the entire engineering department.

{¶97} Ruck testified that she became aware that Stinebaugh was developing a property on Fairview after he submitted a building permit to her office for the house he wished to build. As part of the permit process, Stinebaugh was instructed by Ruck's department to tap into the public sanitary sewer line that was on the other side of Fairview from his property.

{¶98} Ruck testified that Stinebaugh did not want to tap into the Fairview line and so he contacted Ruck's office because he wanted them to look into running another line on an unimproved right-of-way on South Street, to the rear of

Stinebaugh's property. Stinebaugh instructed the engineering department to survey that area to determine if there was enough fall in the elevation for a new sewer line to be put in.

**{¶99}** As a result, the survey work was done and, following a review and some calculations, Ruck's department determined that there was enough elevation for a sewer to be run there. Ruck testified that, once that determination was made, Stinebaugh directed the engineering department to put in the sewer.

**{¶100}** Ruck had reservations about doing so, as the property was a development and sewer lines should be installed at the developer's cost. Ruck explained that if a developer wanted the city to bear the cost of running a sewer line, then the engineering department would normally refer the developer to city council, as Ruck does not have the authority to make such decisions.

**{¶101}** However, in Stinebaugh's case, while she knew it was wrong to do so, Ruck testified that she went along with what Stinebaugh told her to do because he was the mayor. When asked to elaborate further on that, Ruck testified that she voiced her opinion to her direct boss, the Safety Service Director, and told him that they should not put in the sewer for Stinebaugh as to do so was against the city ordinance and policy. She testified that, however, she was then told to do it because Stinebaugh was the mayor and "he could fire you if he wants to." (Tr., 538).

**{¶102}** Ruck testified that the engineering department then calculated the materials and supplies needed for the job, and called Schaub Excavating to come in

and do the sewer installation job. Ruck identified State's Exhibit 24 as the October 5, 2018 purchase order for Schaub Excavating in the amount of $13,234.00 that she wrote for the project, and that the Auditor, Wilbur Wells, and the new Safety Service Director, Floyd Greg, subsequently signed.

{¶103} Ruck testified that while the cost would typically have been paid by the developer, the city paid Schaub Excavating to install the sewer line to Stinebaugh's property. Ruck further testified that Stinebaugh, while a home builder, was also a developer in the sense that he had been developing the lot he owned. Ruck identified the building permit issued to Stinebaugh for the Fairview Drive property, which reflected that the parcel originally purchased by Stinebaugh had been split by him into more than one lot.

{¶104} After viewing the evidence summarized above in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime of Theft in Office proven beyond a reasonable doubt. In particular, the evidence permitted the reasonable inference that while he was mayor, Stinebaugh, with purpose to deprive the City of Wapakoneta of public funds for an expense which Stinebaugh privately bore the responsibility to pay for, knowingly obtained control over those funds without the consent of the Wapakoneta City Council, which was the only entity authorized to give consent for the expenditure of public funds for an extension of the main sewer line at issue.

{¶105} While Stinebaugh argues on appeal, and the majority concurs, that Section 1248.07 of Wapakoneta's Codified Ordinances did not as a matter of law require Stinebaugh to bear the cost of the main sewer line extension in this case, I disagree.

{¶106} The plain language of that ordinance, set forth in its entirety *supra*, makes it clear that a "subdivider or developer shall provide a system of sanitary sewer mains", as well as providing lateral connections for each lot, when a subdivision is being developed. While Stinebaugh's building project involved only one original lot that had been split into two, Stinebaugh qualified as a "subdivider" pursuant to subsection 1240.09(s) of the Wapakoneta Codified Ordinances, which defines "subdivider" as "[a]ny individual, firm, association, syndicate, copartnership, corporation, trust or other legal entity commencing proceedings under these Regulations to effect a subdivision of land hereunder for himself or herself or for another." "Subdivision" is then defined by subsection 1240.09(t)(1) of those ordinances as "[t]he division of any parcel of land shown as a unit or as contiguous units on the last preceding tax roll, into two or more parcels, sites or lots, any one of which is less than five acres, for the purposes, whether immediate or future, of transfer of ownership * * * ."

{¶107} Accordingly, I would find that Stinebaugh's challenge on appeal in the second assignment of error is defeated by a plain reading of Section 1248.07, particularly when the language of that ordinance is considered in conjunction with

the overwhelming evidence presented at trial as to the City of Wapakoneta's well-established practices, procedures, and policies with regard to that ordinance.

{¶108} In sustaining the second assignment of error, the majority also relies on section 208.03 of the Wapakoneta Codified Ordinances and R.C. 735.05. As the majority opinion notes, section 208.03 provides that "[t]he Director of Public Service and Safety is hereby authorized to execute public contracts for the purchase of supplies, materials or labor as provided in Ohio R.C. 735.05." The version of R.C. 735.05 in effect at the time of Stinebaugh's theft in office offense provided, in relevant part:

> The director of public service may make any contract, purchase supplies, or material, or provide labor for any work under the supervision of the department of public service involving not more than fifty thousand dollars. When an expenditure within the department, other than the compensation of persons employed in the department, exceeds fifty thousand dollars, the expenditure shall first be authorized and directed by ordinance of the city legislative authority.

{¶109} The majority reads those two legislative enactments as having given Wapakoneta's Safety Service Director the discretion to expend, without the approval of city council, the approximately $13,000.00 paid to Schaub Excavating to install the extension of the main sewer line to the property being developed by Stinebaugh.

{¶110} However, even assuming that the majority's broad interpretation of those legislative enactments is correct, the record contains no evidence tending to

reflect that the safety service director, who did not testify at trial, invoked any budgetary discretion he may have possessed pursuant to those legislative sections with regard to the sewer line extension at issue here. The fact that Safety Service Director Floyd Greg may have signed the purchase order prepared by Mary Ruck reflects merely that Greg agreed to the City of Wapakoneta paying Schaub Excavating for the sewer project as set forth in that document, not that Greg had exercised some specific and discretionary fiscal authority.

{¶111} Finally, the majority suggests that Stinebaugh may have been guilty of Theft in violation of R.C. 2913.02(A)(4) or R.C. 2913.02(A)(5) [i.e. theft by threat or theft by intimidation], but that the prosecution's theory at trial, being that Stinebaugh committed a theft offense pursuant to R.C. 2913.02(A)(1), somehow fails because the five subsections of the Theft statute are "'mutually exclusive'" and "to be 'read in the disjunctive.'" (Maj. Opin. at 30, quoting 29B Ohio Jur.3d, Criminal Law, § 781 (2024), quoting *State v. Dugger*, 49 Ohio App.2d 220 (9th Dist. 1975), at the syllabus).

{¶112} While I agree with the majority that Stinebaugh may also have been guilty of Theft in violation of R.C. 2913.02(A)(4) or R.C. 2913.02(A)(5), I do not agree with the majority's contention that the five subsections of R.C. 2913.02, the statute defining Theft, are mutually exclusive. A review of *State v. Dugger*, 49 Ohio App.2d 220 (9th Dist. 1975), the case relied upon by the majority in support of that contention, reflects that it was ambiguous language in a former version of R.C.

2913.02 upon which the court in *Dugger* based its holding that the then four subsections of the Theft statute were to be read in a disjunctive, mutually exclusive manner. Subsequent to the decision in *Dugger*, R.C. 2913.02 was amended and that ambiguity was corrected. My research reflects no persuasive authority supporting the proposition that the subsections of the current version of R.C. 2913.02 are to be read and applied in solely a mutually exclusive manner.

{¶113} In conclusion, for all the reasons set forth in this dissent, I am unable to join the majority with respect to the second assignment of error. I would reject Stinebaugh's claim that the predicate theft offense underlying the Theft in Office charge was not supported by sufficient evidence. The second assignment of error should be overruled, and the judgment of conviction and sentence relating to Count 17 should be affirmed.

**/hls**